# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | | |
|---|---|---|
| **BRAD GUIDRY** | * | **CIVIL ACTION NO. 09-1906** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Brad Guidry, born January 17, 1975, filed applications for a period of disability, disability insurance benefits and supplemental security income on July 20, 2007, alleging disability as of July 1, 2007, due to thyroid problems, high blood pressure, heart problems, Graves' disease, and back problems.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Dauterive Hospital dated August 22, 2005 to June 13, 2007**. On June 13, 2007, claimant was seen for palpitations and a history of hyperthyroidism. (Tr. 153). He had recently had alcohol. He had stopped taking his medications two weeks prior. The impression was hyperthyroidism, non-compliance with medications, and sinus tachycardia. (Tr. 154).

**(2) Consultative Examination by Dr. Kenneth A. Ritter, Jr., dated September 24, 2007**. Claimant complained of thyroid problems, high blood pressure, fast heart rates with physical activity, and Graves' disease. (Tr. 160). He had a history of running out of his antithyroid medications frequently. His medications included Propanolol and PTU.

Claimant was a very poor historian. He said that he went to school through the eighth grade. He also complained of occasional headaches, chest pains five to six times a month, and abdominal cramping and loose stools frequently.

Additionally, claimant complained that his left side frequently felt numb. (Tr. 161). He denied cigarette or alcohol use.[1]

---

[1] The records from Dauterive Hospital showed recent alcohol use. (Tr. 153).

On examination, claimant was 5 feet 6 inches tall, and weighed 234 pounds. His visual acuity without glasses was 20/50. He had a large thyroid gland on the right.

Heart exam revealed a sinus tachycardia without a murmur or gallop. Claimant was somewhat obese. Extremities were normal. Neurologically, DTRs were increased bilaterally in the upper and lower extremities. (Tr. 162).

Dr. Ritter's impression was hyperthyroidism secondary to Graves' disease. He noted that claimant was very non-compliant with his medications, and was somewhat thyrotoxic with elevated blood pressure and fast heart rate. He exhibited a very poor understanding of his problem or what to do about it.

In the Medical Assessment of Ability to do Work-Related Activities (Physical), Dr. Ritter determined that claimant could lift/carry 15 to 25 pounds occasionally and 10 to 15 pounds frequently. (Tr. 163). His ability to stand/walk and sit were not affected by his impairment. He could frequently stoop, kneel, balance, crouch, and crawl, and occasionally climb. He had no other limitations. (Tr. 164).

**(3) Physical Residual Functional Capacity ("RFC") Assessment dated October 11, 2007**. Dr. Timothy Honigman found that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 176). He could stand/walk or

sit about six hours in an eight-hour workday. He had unlimited push/pull ability. He had no other limitations.

**(4) Consultative Psychological Examination by Alfred E. Buxton, Ph.D., dated November 6, 2007**. Dr. Buxton noted at the outset that claimant presented "in a bogus or otherwise fake bad fashion." (Tr. 188). Claimant reported that he had attended school through the sixth grade, was functionally literate, and had quit school at age 17. He reported that he had last worked in 2006 doing simple labor for two days, and was let go because he had had a conflict with a co-worker. He said that he had not worked since then because "nobody want me on their job."

Claimant reported that his mental health was "not good," but he had no mental health treatment history. (Tr. 189). He was on medications for Graves' disease and high blood pressure. Sleep was restless, and appetite was good.

Claimant's primary hobby was to watch television. He did not help out with household chores or shop. He could manage his money and engage in some independent travel.

On examination, verbal receptive and expressive language skills were good. Dress and groom was good. Social skill was adequate.

Dr. Buxton noted that although it was likely that claimant was of subaverage general intellect, he was "certainly not as impaired as he attempts to

present himself." In fact, Dr. Buxton questioned whether there was "anything actually wrong with him" from a mental health perspective, other than that he was "a bit intellectually dull and attempting to present himself in a bogus or fake bad fashion due to issues of secondary gain."

Dr. Buxton opined that claimant's intellectual functioning was probably in the borderline range of subaverage general intellect with commensurate adaptive daily living skill development. He thought that claimant was probably at least marginally competent as a manager of his own personal affairs. He stated that despite claimant's attempt to present himself as having some type of mental health disturbance, there was nothing that would lead to a clinical diagnosis of a disturbance. (Tr. 190).

Claimant's Global Assessment of Functioning score was estimated at greater than or equal to 65 over the last 12 months. Dr. Buxton opined that from a psychological perspective, there was nothing presented which would preclude him from securing and maintaining gainful competitive employment.

**(5) Mental Residual Functional Capacity ("RFC") Assessment dated November 13, 2007**. Joseph Kahler, Ph.D., found that claimant was moderately limited as to his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform

5

activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; interact appropriately with the general public; travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (Tr. 191-92).

**(6) Psychiatric Review Technique dated November 13, 2007**. Dr. Kahler assessed claimant for borderline intellectual functioning. (Tr. 196). He found that claimant had mild restriction of activities of daily living and difficulties in maintaining social functioning. (Tr. 205). He determined that claimant had moderate difficulties in maintaining concentration, persistence, or pace.

**(7) Records from Iberia Comprehensive Community Health Center ("ICCHC") dated November 30, 2007 to February 1, 2008**. On November 30, 2007, claimant complained of anxiety and trouble sleeping. (Tr. 212). His diagnoses were hypertension and hyperthyroidism. He did not show up for his next appointment. (Tr. 211).

On February 1, 2008, claimant stated that he had been off of all medications for two days. (Tr. 211). He was prescribed Inderal for hypertension and given samples of Rozerem for insomnia.

**(8) Records from University Medical Center ("UMC") dated September 12, 2007 to August 28, 2008**. On September 12, 2007, claimant complained of

6

chest pain. (Tr. 228). An ECG was borderline and showed sinus tachycardia. (Tr. 236, 237). The assessment was hyperthyroidism. (Tr. 228).

On March 6, 2008, claimant was seen for uncontrolled hyperthyroidism. (Tr. 222). An ultrasound dated April 21, 2008, revealed enlargement of both thyroid lobes. (Tr. 233). Claimant's diagnoses were hyperthyroidism and high blood pressure (144/95) on August 28, 2008. (Tr. 219).

**(9) Records from ICCHC dated February 29, 2008 to September 12, 2008**. On June 20, 2008, claimant's diagnoses were hyperthyroidism, hypertension – controlled with medications, and tachycardia due to hyperthyroidism. (Tr. 249). He complained of chest pains and uncontrolled hyperthyroidism on August 3, 2008. (Tr. 248). On September 12, 2008, he reported anxiety, depression, and elevated blood pressure. (Tr. 246). His hypertension medication was changed to Micardis. (Tr. 247).

**(10) Report from Dr. Naomi Friedberg dated November 9, 2008**. Claimant was referred to Dr. Friedberg by his attorney. (Tr. 252). He reported that he rarely drove because his medications made him feel dizzy. He said that he had attended school through the 9th grade in special education classes. (Tr. 254).

Claimant also complained of depression. (Tr. 253). His medications included Ibuprofen, Micardis, Propylthiouracil for thyroid, Propranolol for blood

7

pressure, and Rozerem for sleep disturbance. (Tr. 254). He reported that he was going to New Iberia Mental Health Center for his depression. He denied using alcohol, cigarettes, or illicit drugs.

On examination, claimant's thought processes were generally logical and coherent, although somewhat simple. He indicated that his depression was at times significant, and admitted to frequent suicidal thoughts. He denied having any psychosis and did not mention significant anxiety. He reported feeling sad and down, and had significant sleep disturbance related to his mood difficulties. He admitted to agitation throughout the day because of his depressed mood.

Claimant was oriented in all spheres. His mood and affect were somewhat flat.

Administration of the Wechsler Adult Intelligence Scale-III revealed full-scale, verbal, and performance scores in the mild mentally disabled range. (Tr. 255). His verbal IQ score was 67, performance was 67, and full scale was 64. (Tr. 256).

Dr. Friedberg's assessment was adjustment disorder with depressed mood, rule out major depressive disorder, moderate to severe, and mild mentally disabled. She opined that claimant's ability to understand, remember, and carry out simple instruction appeared to be generally intact. His ability to understand,

remember, and carry out moderate and detailed instruction appeared to be negatively impacted by low intellectual functioning, as well as his reported physical difficulties. His adaptive functioning was also greatly negatively impacted by a current mood disorder, related to his physical decline.

Additionally, Dr. Friedberg found that claimant's ability to maintain attention to perform simple, repetitive tasks over a two-hour block of time appeared to be somewhat limited. His ability to sustain effort and persist at a normal pace over the course of a 40-hour workweek would be negatively impacted by his stated difficulties. His ability to related to others appeared to be generally intact, although he admitted to significant mood disturbance and agitation, as well as frequent suicidal thoughts.

Dr. Friedberg opined that claimant might have difficulties tolerating the stress and pressure associated with day-to-day work activity. He had not addressed his mood problems, but had reported seeking help for this at the New Iberia Mental Health Center. She concluded that claimant most likely could do basic money management, but would most likely benefit from help in managing personal financial affairs.

**(11) Records from UMC dated November 11, 2008 to December 8, 2008**. On November 11, 2008, claimant complained of palpitations and hot flashes. (Tr.

9

265). His TSH was less than 0.01. (Tr. 263). The assessment was hyperthyroid. (Tr. 266).

**(12) Records from ICCHC dated December 15, 2008**. Claimant was seen for hypertension, reflux, and hyperthyroidism. (Tr. 268). He was prescribed Nexium for reflux.

**(13) Claimant's Administrative Hearing Testimony**. At the hearing on January 26, 2009, claimant testified that he had last worked for five or six months cutting grass on a farm. (Tr. 37). He stated that he left because he was always calling in sick. He reported that he had stopped working because his heart was always racing and he had a thyroid problem. (Tr. 38). He had also worked at the housing authority and at a nursing home, but was let go when started missing work for tachycardia attacks. (Tr. 44).

Claimant testified that he did not drive because of his medications for thyroid and blood pressure . (Tr. 40, 46). He complained that his medication was not helping him. (Tr. 40). He reported that his heart fluttering episodes lasted about 15 to 20 minutes. (Tr. 41). He said that he did not sleep at all.

Additionally, claimant stated that he did not walk anymore because of his heart fluttering. (Tr. 42). During the day, he sat down, watched tv, and walked to the end of the driveway.

As to his background, claimant testified that he was in special education classes while in school. (Tr. 43). He stated that he could read and write small words.

**(14) Administrative Hearing Testimony of William Stampley, Vocational Expert ("VE")**. The ALJ posed a hypothetical in which he assumed that claimant had the residual functional capacity for light work; was able to do simple work; had difficulty interacting with the general public and time demand situations because of slow pace, and might require assistance with traveling unfamiliar areas, goal setting, and planning. (Tr. 38). In response, Mr. Stampley testified that claimant would not be able to do any of his prior work. However he could work as a hand washer, of which there were 491 positions statewide and 18,158 nationally, and housekeeping cleaner, of which there were 6,832 positions statewide and 445,503 nationally. (Tr. 38-39).

**(15) The ALJ's findings are entitled to deference**. Claimant argues that the ALJ failed to consider his non-exertional impairment of borderline intellectual functioning when presenting his case to the Vocational Expert at the hearing. [rec. doc. 10, p. 3]. However, the record reflects that the ALJ specifically referred to claimant's non-exertional impairment of borderline intellectual functioning in his hypothetical to the vocational expert. (Tr. 216). In formulating the hypothetical to

11

the VE, the ALJ included the limitations that claimant was able to do only simple work; had difficulty interacting with the general public and time demand situations because of slow pace, and might require assistance with traveling unfamiliar areas, goal setting, and planning. (Tr. 38). Thus, this argument lacks merit.

Additionally, claimant argues that the ALJ failed to include his limitations due to Graves' disease. [rec. doc. 10, p. 4]. While the ALJ found that claimant's Graves' disease was a severe impairment, the ALJ determined that claimant's statements concerning the intensity, persistence, and limiting effects of this symptoms were not credible. (Tr. 29). This finding is supported by the opinion of Dr. Ritter, who found that with claimant's limitations from Graves' disease, he could still lift/carry 15 to 25 pounds occasionally and 10 to 15 pounds frequently; had no limitations as to his ability to stand/walk and sit; could frequently stoop, kneel, balance, crouch, and crawl, and could occasionally climb. (Tr. 163).

Further, Dr. Ritter noted that claimant was very non-compliant with his medications, which is confirmed by the medical records. (Tr. 153-54, 160, 162, 211). It is well established that failure to follow prescribed medical treatment precludes an award of benefits. 20 C.F.R. § 404.1530(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990). As the ALJ's hypotheticals to the vocational expert reasonably incorporated all disabilities of the claimant

recognized by the ALJ, and the claimant or her representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Finally, claimant argues that the ALJ erred in failing to find that he met the listing at Section 12.05 based on the examination of Dr. Friedberg. [rec. doc. 10, p. 6]. Section 12.05C in the listing of impairments provides as follows:

> 12.05 *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ***
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function.

(emphasis added). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.

Claimant argues that he meets this listing, because he suffered with borderline intellectual functioning. However, although claimant attained a verbal

13

IQ score of 67, performance of 67, and full scale of 64 when tested by Dr. Friedberg, claimant has not established that he met the initial part of the listing, that is, "*significantly subaverage general intellectual functioning with deficits in adaptive functioning* initially manifested during the developmental period; i.e., *the evidence demonstrates or supports onset of the impairment before age 22*." (emphasis added).

Additionally, the record shows that claimant was not credible. While he told Dr. Friedberg that he had a 9th grade education in special education course work, he informed Dr. Ritter that he attended school through the 8th grade, and reported to Dr. Buxton that he went as far as the sixth grade. (Tr. 160, 188, 254). Further, Dr. Buxton noted that although it was likely that claimant was of subaverage general intellect, he was "certainly not as impaired as he attempts to present himself." (Tr. 189). In fact, Dr. Buxton questioned whether there was "anything actually wrong with him" from a mental health perspective, other than that he was "a bit intellectually dull and attempting to present himself in a bogus or fake bad fashion due to issues of secondary gain."

The ALJ did not accept claimant's IQ scores, noting that claimant malingered when evaluated by Dr. Buxton. (Tr. 28). It is well established that the ALJ's finding as to credibility is entitled to great deference. *Newton v. Apfel*, 209

F.3d 448, 458 (5th Cir. 2000). Further, "the ALJ has *sole* responsibility for determining a claimant's disability status," and is free to reject the opinion of any expert when the evidence supports a contrary conclusion. (emphasis added). *Id.* at 455 (5th Cir. 2000) (citing *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)). Accordingly, it was within the province of the ALJ to rely on Dr. Buxton's opinion rather than Dr. Friedberg's. Thus, this argument lacks merit.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN**

**FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

May 18, 2011, Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE